UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 3:17-cr-167 |
| v. ) | |
| ) | Judge Trauger |
| HOMERO QUINTANILLA NAVARRO ) | |

**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
FOR COMPASSIONATE RELEASE**

The United States of America, by and through Donald Q. Cochran, United States Attorney for the Middle District of Tennessee, and the undersigned counsel, Assistant United States Amanda Klopf, hereby responds to the defendant's Supplemental Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) (the "motion") (DE# 36, Supplemental Motion for Compassionate Release.) Homero Quintanilla Navarro (Quintanilla) is currently serving a sentence of 120 months for conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine, possession with intent to distribute 5 kilograms or more of cocaine, and illegal reentry of a previously deported felon. On August 5, 2017, Mr. Quintanilla was caught with approximately ten kilograms of cocaine and admitted to obtaining and distributing two more kilograms of cocaine approximately two weeks earlier. This conduct occurred less than a year after Quintanilla was deported on November 4, 2016. He has served less than three years of his ten year sentence.

On May 23, 2020, pursuant to an order from this Court directing appointed counsel to evaluate Quintanilla's various *pro se* filings, Quintanilla through counsel filed a Supplemental Motion for Compassionate Release. Navarro has failed to meet his burden for the relief he requests in two ways.

1

First, he has not demonstrated "extraordinary and compelling reason" as defined by the statute. Nor has he proven through his release plan that he would receive "better" medical treatment if released.

Second, the United States respectfully submits that release would not adequately address the factors set forth in 18 U.S.C. § 3553(a).

## I. Factual Background

On August 7, 2017, Quintanilla was arrested pursuant to a complaint, and has been continuously in custody since that point. (DE #1, Complaint.) Quintanilla was charged with three different counts: Conspiracy to distribute and possess with intent to distribute 5 kilograms of more of cocaine; Possession with intent distribute 5 kilograms of more of cocaine; and Illegal reentry of a previously departed felon (PSR, at ¶ 1). On August 30, 2017, pursuant to a binding plea agreement, Quintanilla pled guilty to all three counts, and admitted a supervised release violation related to a prior federal charge. (DE #21, Plea Agreement.)

Quintanilla is a citizen of Mexico. ICE records indicate that between 2004 and 2008, Quintanilla was voluntarily returned to Mexico ten times, and reentered after each voluntary return. (*Id.*, at ¶ 15.) Starting in 2008, he was deported five different times, and has illegally reentered after each deportation.

Specifically, on October 12, 2008, he applied to enter the United States and falsely claimed to be a citizen of the United States. (*Id.* at ¶ 6.) As a result, he was convicted of reentry by the United States District Court, Southern District of Texas, and received 75 days custody. (*Id.*) On December 24, 2008, Quintanilla was removed from the United States. (*Id.*, Less than a year later, on April 1, 2009, he illegally reentered the United States from Mexico and was taken into custody. (*Id.* at ¶ 7.) On August 18, 2009, he was again removed from the United States. Following his

2

deportation, sometime in 2011, Quintanilla illegally reentered the United States again. (*Id.* at ¶ 8.) On November 10, 2012, Quintanilla was arrested in Nashville, Tennessee for reckless driving and sentenced to 6 months custody, suspended, and placed on probation for 6 months. On November 19, 2012, he was again removed from the United States. (*Id.*, at ¶ 8.) He illegally reentered the United States again. Less than a year later, on May 1, 2013, Quintanilla was detained in Nashville, Tennessee for Driving Under the Influence and was sentenced to 11 months and 29 days in custody, all but 48 hours suspended, and put on probation for 11 months and 29 days. (*Id.* ¶ 9.) He was then removed from the United Sates on May 24, 2013. (*Id.*, at ¶ 9.) Approximately a week later, on June 1, 2013, Quintanilla illegally reentered the United States. (*Id.* at ¶ 10.) He was (again) convicted of Unlawful Reentry of a Removed Alien. (*Id.*) This time, he was sentenced to 6 months' custody, to be followed by 1 year of supervised release. (*Id.*) Following his sentence, he was removed from the United States on November 4, 2016. (*Id.*, at ¶ 7.)

Less than a year later, on an unknown date, Quintanilla again illegally reentered the country. (*Id.* at ¶ 11.) On August 4, 2017, while still on supervised release, Quintanilla contacted a confidential informant he was ready to start selling cocaine again. (*Id.*, at ¶¶ 11, 51.) When he was arrested on August 5, 2017, he had two bags of cocaine weighing a total of 9.929 kilograms. (*Id.* at ¶13.) He admitted to also receiving and distributing 2 more kilograms of cocaine two weeks prior, and he told the agents he received the cocaine from a source in Mexico he refused to name. (*Id.*, at ¶ 14.)

On about April 18, 2020, Quintanilla submitted a request for release to the Warden due to the Covid-19 crisis. On May 23, 2020, he filed a motion for compassionate release due to "extraordinary and compelling reason" where he asks the Court for immediate release which would trigger a deportation to Mexico. (Defendant Motion, at p. 1.)

## II. Legal Authority

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

> (c) **Modification of an Imposed Term of Imprisonment**.— The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (a) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction…. and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission….

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Accordingly, the relevant policy statement of the Commission is binding on the Court. *See Dillon v. United States,* 560 U.S. 817, 827 (2010) (where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued

4

by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).[1]

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

Critically, in application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A) **Medical Condition of the Defendant**.—
>
>     (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
>     (ii) The defendant is—
>
>         (I) suffering from a serious physical or medical condition,

---

[1] Prior to the passage of the First Step Act, while the Commission policy statement was binding on the Court's consideration of a motion under § 3582(c)(1)(A), such a motion could only be presented by BOP. The First Step Act added authority for an inmate himself to file a motion seeking relief, after exhausting administrative remedies, or after the passage of 30 days after presenting a request to the warden, whichever is earlier

    Under the law, the inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon*, 560 U.S. at 827-28 (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under Section 3582(c)(2) regarding the imposition of a sentencing modification).

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) **Age of the Defendant**.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) **Family Circumstances**.—

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) **Other Reasons**.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

For its part, consistent with note 1(D), the Federal Bureau of Prisons promulgated Program Statement 5050.50, available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf, amended effective January 17, 2019, to set forth its evaluation criteria.

BOP Program Statement 5050.50 both quotes and follows the Code of Federal Regulations' procedure for an inmate's submission of his compassionate release request, 28 C.F.R. § 571.61. The regulations **require** the submission to be 1) to the warden, 2) in writing, 3) by the inmate, and "at a minimum [to] contain the following information:

(1) The extraordinary or compelling circumstances that the inmate believes warrant consideration.

6

> (2) Proposed release plans, including where the inmate will reside, how the inmate will support himself/herself, and, if the basis for the request involves the inmate's health, information on where the inmate will receive medical treatment, and how the inmate will pay for such treatment.

28 C.F.R. § 571.61(a). These requirements are necessary for the BOP to assess the inmate's request. Thus, inmates that petition for compassionate release bear the initial burden of production. *Id.*

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *United States v. Heromin,* 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019). He likewise "bears the burden of showing that he exhausted his administrative rights with the BOP before filing his compassionate-release motion." *United States v. Van Sickle*, 2020 WL 2219496, at *3 (W.D. Wash. May 7, 2020) (collecting cases). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

### III. Discussion

This Court should deny Quintanilla's motion for a reduction in his sentence because: 1) he failed to prove a "compelling and extraordinary" reason for his release, he has not shown any plan for where he will receive medical treatment and how he will pay for such treatment should he be released, or that his chosen location will put him at less risk of contracting Covid-19; and 2) the §3553(a) factors weigh strongly against relief.

### A. BOP's Response to the Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge. BOP has explained that "maintaining

safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization. On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

The BOP extended Phase Five of the Action Plan, which currently governs operations, into a Phase Six. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees

8

among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.*, medical or mental health care, religious, *etc.*) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp. Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, inmates have become ill, and more likely will in the weeks ahead. But, BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It

must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

**B. Quintanilla Has Failed to Prove Any "Extraordinary and Compelling Reasons" Warranting a Sentence Reduction**

Quintanilla, who is 5'2 and 250 pounds, has both diabetes and high blood pressure. He also reports that he has high cholesterol and has suffered liver damage. (Defendant Motion, at ¶ 115.) As the CDC notes, diabetes, severe obesity, and liver disease (which Quintanilla does not claim to have but does report liver damages) are all conditions that, "may put people at higher risk for severe illness from COVID-19." *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. The CDC advises people with diabetes to "[c]ontinue taking your diabetes pills and insulin as usual," "[t]est your blood sugar every four hours and keep track of the results," "[m]ake sure that you have at least a two-week supply of your diabetes pills and insulin," and "[f]ollow the sick day guidelines for people with diabetes" (which generally involves having ample supplies of certain foods, drinks, and medicines on hand). *Id.* They likewise advise those with severe obesity (BMI over 40) to, "Take your medications for any underlying health conditions exactly as prescribed." *Id.*

Quintanilla's medical records show that his medical issues have been well-managed in prison. For example, a report from January 2, 2020 shows Quintanilla calling in for a medical follow up saying, "I have been feeling good and have not had problems since I finished my treatment" and he reported no pain. (Defendant's Under Seal Exh., Bureau of Prisons Health

10

Services Clinical Encounter, pp. 1.) A report from February 11, 2020 shows that Quintanilla's diabetic foot exam showed "no diabetic foot ulcers" and Navarro was given a plan of care. (Defendant's Under Seal Exh., Bureau of Prisons Health Services Review, pp. 3, 5.)

If the court were to just consider Quintanilla's specific ailments, many inmates with more severe conditions and less time on their sentence have failed to demonstrate "extraordinary and compelling" basis for relief. *See United States v. Mazur*, 2020 WL 2113613 (E.D. La. May 4, 2020) (holding a defendant with 6 months remaining on 24-month term for firearms offenses; a risk presented at Butner Medium facility, which had an outbreak, along with health conditions of myeloid leukemia and hypertension, did not present an extraordinary and compelling basis for relief, given BOP's efforts to address the issues); *United States v. Fry*, 2020 WL 1923218 (D. Minn. Apr. 21, 2020) (holding a 66-year-old man who is obese and has heart disease and high blood pressure should be denied because; "To merit such compassionate release, Fry must show more than a mere speculation of the possibility of contracting the virus.") Inmates with Quintanilla's specific medical conditions have also been denied. *See United States v. Peaks*, 2020 WL 2214231 (E.D. Mich. May 7, 2020) (holding Elkton inmate that has BMI of 44 and hypertension, but is relatively young (31); does not meet the test for extraordinary and compelling circumstances); *United States v. Desage*, 2020 WL 1904584 (D. Nev. Apr. 17, 2020) (holding relief should be denied for inmate at the outset of 36-month sentence because although he is diabetic, he will be isolated and BOP is endeavoring to keep inmates safe).

In addition to failing to satisfy his burden that he has an ailment that would fit the definition in the statue, Quintanilla did not follow the requirement of 28 C.F.R. § 571.61 and BOP Program Statement 5050.50. To initiate a proper request for compassionate release, a defendant must submit, among other things, "[p]roposed release plans, including where the inmate will reside, how

11

the inmate will support himself/herself, and, if the basis for the request involves the inmate's health, information on where the inmate will receive medical treatment, and how the inmate will pay for such treatment." 28 C.F.R. § 571.61(a)(2). Such plans form an important part of the compassionate-release analysis, because without them it is impossible to gauge the relative risks and benefits of release.

His proposed release plan did not include any information regarding how he would obtain better medical care for his ailments outside of prison or how he would pay for it. He simply asserts his plan to be deported to Mexico "where he would live "with family." (Defendant Motion, at p. 12.) He does not provide any specificity on where in Mexico, or with which family. His PSR notes that his wife is currently incarcerated in the Tennessee Department of Correction, (PSR ¶ 59), both of his parents have passed away (PSR ¶ 60), he does not know where his in-laws or son are located (PSR ¶ 67), and he has no contact with his other three children (PSR ¶68). Further, given that he has illegally reentered the United States on 15 different occasions after voluntary removals and deportations, the last time while on supervised release for an illegal reentry conviction, and the lack of specificity on the location or family members, it is difficult to believe that Quintanilla actually intends to stay in Mexico.

As such, even if this Court were to interpret application note 1(D) of § 1B1.13 to grant the Court authority to create its own new definition, this Court still cannot release Quintanilla because he failed to provide a proposed release plan on how he would obtain better medical care and how he would pay for it. As such, the United States will not specifically address Quintanilla's claims that the BOP provided inadequate care for his diabetes and obesity because he has not identified a better plan. Indeed, he has no plan. At least while in the BOP, he has a medical plan and is being treated for his medical conditions. *See United States v. Miles*, 2020 WL 1989290 (S.D.N.Y. Apr.

12

27, 2020) (56-year-old suffers from asthma, but has struggled with substance abuse and compliance with supervised release, and has no residence; release "will in fact place him at a higher risk of contracting COVID-19, effectively undoing the very reason for his compassionate release")

Moreover, as he fails to even articulate the location in Mexico, it is impossible to know if Quintanilla would be at more risk in Mexico than he would be at Oakdale FCI as this Court cannot compare the relative levels of cases. *See United States v. Feiling*, 2020 WL 1821457 (E.D. Va. Apr. 10, 2020) (holding a 71-year-old inmate who suffers from a variety of ailments putting him at risk of an adverse outcome from COVID-19, should be denied because he does not show a greater risk of contracting the disease in prison, in relation to his risk in the community).

In the absence of any release plan, it is impossible for this Court to evaluate whether Quintanilla will be at a meaningfully lower risk of infection if released; whether he will have health insurance or be able to support himself; whether he will have comparable access to preventive treatment if released (and thus whether he will continue to be able to manage his blood pressure and diabetes in the manner suggested by the CDC); and whether he will have access to comparable medical treatment if he becomes ill.

### C. The facts and circumstances of this case, including Quintanilla's extensive criminal history, weigh against release.

Even if Quintanilla had shown extraordinary and compelling reasons, his motion should still be denied, because he has failed to demonstrate that he is not a danger to the community or otherwise merits release under the § 3553(a) factors.

Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community."

U.S.S.G. § 1B1.13(2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

Quintanilla would pose a danger to public safety if released. Less than a year after he was convicted of illegal reentry and deported, he was caught with 9.929 kilograms of cocaine that he was trying to sell to a confidential informant, and admitted prior distribution of two additional kilograms of cocaine. He has two convictions for Illegal Reentry. He has illegally reentered after 10 voluntary returns, and been deported and illegally reentered a total of five times. Therefore, he has illegally reentered the United States a total of 15 times.

This Court imposed a sentence of 120 months, the mandatory minimum sentence for Counts One and Two of the indictment, which was commensurate with the underlying offenses. This sentence reflected the seriousness of his underlying offenses, promoted respect for the law, and provided just punishment for his violations. Releasing him now, when he has served only approximately 34 months of a 120 month sentence, would not adequately reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and would result in a greater disparity of offenders who engage in similar conduct. *See United States v. Kincaid*, -- F. App'x --, 2020 WL 2521303, at *1-2 (6th Cir. May 18, 2020) (order) (holding that it is appropriate for district courts to consider the percentage of the overall sentence left to be served when addressing compassionate release motions).

Quintanilla has illegally reentered the United States from Mexico 15 times since 2008, and while in the United States has committed multiple felonies including distribution of a significant quantity of cocaine. His release plan places him in Mexico, with no specific location or family

mentioned. Given his history of illegal reentry, there is no reason to believe that now, after his 16th removal, he would actually stay in Mexico. Accordingly, in light of Quintanilla's record and history of reentry, and the totality of relevant circumstances, this Court should deny the motion for a sentence reduction.

Should this Court grant his sentence reduction and release, the United States respectfully requests that he not be released until he is quarantined for 14 consecutive days and tests negative for COVID-19.

### IV. CONCLUSION

Although COVID-19 is an extraordinary world event that understandably causes grave concern for all inmates, and particularly those with underlying health issues, Quintanilla has failed to show that its impact on him constitutes "extraordinary and compelling reasons" warranting his immediate release pursuant to 18 U.S.C. § 3582(c)(1)(A). His has not presented a release plan showing that his transfer to home confinement would meaningfully improve his health prospects. In addition, his significant criminal history and history of illegal reentry, combined with the seriousness of the underlying offense, weigh heavily against release.

Respectfully submitted,

DONALD Q. COCHRAN
United States Attorney for the
Middle District of Tennessee

*/s/ Amanda J. Klopf*
AMANDA J. KLOPF
Assistant United States Attorney
United States Attorney's Office
Middle District of Tennessee
110 9th Avenue South, Suite A-961
Nashville, Tennessee 37203
(615) 736-5151

CERTIFICATE OF SERVICE

  I hereby certify that on this, the 4th day of June, 2020, I electronically filed the foregoing with the Clerk of the Court under seal using the CM/ECF system. I have provided an electronic copy of such filing to Michael C. Holley, counsel for defendant.

          */s/ Amanda J. Klopf*
          AMANDA J. KLOPF
          Assistant United States Attorney