IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | NO. 3:13-cr-00012 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| | ) | |
| CHARLES JEFFREY EDWARDS | ) | |

## AMENDED MEMORANDUM OPINION

Pending before the Court is Defendant's renewed Motion for Compassionate Release (Doc. No. 481, "Motion"), whereby Defendant seeks reduction of his 72-month sentence and immediate release from the custody of the Bureau of Prisons ("BOP"), pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Like many other federal inmates in this district and around the country, Defendant claims that the ongoing COVID-19 pandemic, as applied to his specific situation, constitutes "extraordinary and compelling reasons" warranting so-called "compassionate release" under Section 3582(c)(1)(A)(i).[1] He relies primarily upon his particular medical profile and the fact that the facility where he is confined, Federal Medical Center ("FMC") Fort Worth has had a major outbreak of COVID-19. For the reasons set forth herein, the Motion will be granted.

THE PARTIES' RESPECTIVE POSITIONS, OVER TIME

Defendant's original motion for compassionate release (Doc. No. 475), was filed on April 14, 2020. The Government filed a response in opposition (Doc. No. 477) nine days later, asserting

---

[1] A motion under Section 3582(c)(1)(A) is actually a motion for a reduction in sentence, including but not limited to reductions that would result in the defendant-movant's immediate release. Although the grant of a motion for sentence *reduction* would not necessarily result in the defendant's immediate *release*, generally such motions are known as ones for "compassionate release," perhaps because they typically do seek immediate release rather than a mere reduction that would result in an earlier release someday but not immediately.

that the motion was premature because Defendant had not administratively exhausted his remedies within the BOP as is, according to the Government, absolutely required under Section 3582(c)(1)(A)(i). Agreeing with the Government that it could not disregard the statutory exhaustion requirements, the Court issued an Order denying the Motion without prejudice to being refiled once the time of exhaustion has arrived—meaning (i) once Defendant fully exhausted his administrative rights to appeal a failure of the BOP to bring a compassionate release motion, or, if earlier (ii) once 30 days had elapsed since Defendant requested that the BOP bring such a motion. *United States v. Edwards*, No. 3:13-CR-00012-1, 2020 WL 1987288 (M.D. Tenn. Apr. 27, 2020).

On May 1, 2020, Defendant filed the instant Motion, evidently taking the position that 30 days had elapsed since Defendant requested BOP to bring such a motion. In the Motion, Defendant highlighted his medical conditions, namely, "diabetes, high-blood pressure, a 'rare disorder' called syringomyelia, in which a cyst forms on the spinal cord, and another disorder called dysautonomia, which causes wide fluctuations in his blood pressure." (Doc. No. 481 at 1).

The Government filed a response (Doc. No. 483) to the Motion five days later, asserting that the Motion was still premature because Defendant simply had not yet made a true request for compassionate release but rather merely an informal request for home confinement; the Government also opposed the Motion on the merits, arguing that the Motion did not show the "extraordinary and compelling reasons" required for compassionate release. After Defendant filed a reply (Doc. No. 486) to the Government's response, as well as a notice in further support of his claim to have made a true request for compassionate release (Doc. No. 487), the Court issued an Order seeking clarification regarding one key aspect of the Government's position on the Motion:

> In a different case, the Court recently took a position on an issue that has
> divided the courts, ruling that it lacked the authority to grant compassionate release
> under U.S.S.G. § 1B1.13 Application Note 1(D) based on "other" extraordinary
> and compelling reasons—*i.e.*, extraordinary and compelling reasons existing in the

defendant-movant's case that are not within the scope of U.S.S.G. § 1B1.13 Application Note 1(A), 1(B), or 1(C)—not advanced (or "determined" as Application Note 1(D) puts it) by the Director of the Bureau of Prisons (BOP). *See United States v. Medlin*, Case No. 3:09-cr-00204-1, Doc. No. 105 (M.D. Tenn. May 7, 2020). And in that case, consistent with the Court's eventual ruling, the Government had asserted that relief for that defendant could not be predicated on "other" extraordinary and compelling reasons under Application Note 1(D), because the Director of BOP had not determined that any such "other" reasons existed in that defendant's case. (Doc. No. 103 at 7 n.4).

In light of the Government's prior stated position and the Court' prior ruling, and given some ambiguity of the Government's argument in this case, the Court requires clarification of the Government's position. In particular, the Government stated, "Assuming Defendant continues to suffer from diabetes, that condition may satisfy the standard of 'extraordinary and compelling reasons,' particularly in light of the high infection rate at FMC Fort Worth." (Doc. No. 483 at 7-8). But the Government did not identity which provision of Application Note 1 it believes could be the "standard" of "extraordinary and compelling reasons" possibly satisfied by diabetes (assuming Defendant in fact suffers from it). Moreover, the Government asserted (not without reason) that "'[c]hronic conditions that can be managed in prison are not a sufficient basis for compassionate release.'" (*Id.* at 6 (quoting *United States v. Ayon-Nunez*, No. 1:16-CR-00130-DAD, 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020))).

One interpretation of the latter assertion is that the Government's view is that a chronic condition cannot support compassionate release under Application Note 1(A) *if* it can be managed in prison. This interpretation is the grammatically proper one, given that the word "that"—rather than "which," preceded by a comma—was used in the quote from *Ayon-Nunez* on which the Government relies here. Under an alternative interpretation of this assertion, however, the Government's view is that a mere "chronic" condition (which, to the undersigned, seemingly would include diabetes), as contrasted with a "terminal" condition, *never* can support compassionate release under Application Note 1(A). This interpretation arguably fits best with the reality that many if not all chronic conditions are not— or at least arguably should not be—referred to as something from which a person does or does not "recover."[1] Under this second interpretation, if diabetes "may satisfy the standard of 'extraordinary and compelling reasons,'" as the Government has stated, then it could do so only under Application Note 1(D). If so, then it would seem that the Government's view in this case—contrary to its view in the prior case—is that a court can find other "extraordinary and compelling reasons," and thus grant compassionate release, under Application Note 1(D) regardless of any determination (or lack thereof) of the Director of BOP. And if that is the Government's view, the Court needs to know that.

Accordingly, by May 13, 2020, the Government shall identify for the Court which provision(s) of Application Note 1 to U.S.S.G. § 1B1.13 it believes is (or

are) the "standard of 'extraordinary and compelling reasons'" that "may [be] satisf[ied]" by Defendant's diabetes. (Doc. No. 483 at 7-8). Once the Court receives this clarification, the Court shall proceed as appropriate to decide the Motion, taking into account the Government's contested assertion that Defendant has not exhausted his administrative remedies.

(Doc. No. 489). On May 13, 2020, responding to this Order, the Government provided helpful clarification of its position. (Doc. No. 493). The Government noted its agreement with the holding in *Medlin* that where (as here) the Director of the BOP had not determined that there were "other" extraordinary and compelling reasons justifying compassionate release, the Court could not ground compassionate release on its own determination that there are such "other" reasons for purposes of U.S.S.G. § 1B1.13 Application Note 1(D). (*Id.* at 2). The Government also clarified that it accepted that Defendant had Type 2 diabetes and that "a chronic condition such as diabetes may satisfy the 'extraordinary and compelling' standard under Application Note 1(A)(ii)(I) of U.S.S.G. § 1B1.13, when coupled with a COVID-19 outbreak at a federal BOP facility." (*Id.*). The Government further clarified that its position was that "Defendant's medical condition could plausibly decrease his ability to provide self-care against serious injury or death at FMC Fort Worth if he contracted Coronavirus." (*Id.* at 3).

Collectively, then, the Government's May 13 response made clear that in this case, the Government believes that (a) compassionate release cannot be grounded on Application Note 1(D); (b) compassionate release conceivably could be grounded on Application Note 1(A)(ii)(I); (c) Application Note 1(A)(ii)(I) would *not* be inapplicable on the ground that Defendant does not have a medical condition "that substantially diminishes the ability of [Defendant] to provide self-care within [FMC Forth Worth] and from which he is not expected recover." U.S.S.G. § 1B1.13 n.1(A).

The Government's May 13 response indicated the Government's position on four additional relevant issues. Specifically, the Government: (1) continues to maintain that the Motion should be denied at this time due to the alleged failure of administrative exhaustion; (2) now takes no particular position as to whether the requirements of Application Note 1(A)(ii)(I) have been satisfied in this case; and (3) believes that if those requirements have been satisfied in the Court's view, such that the Court must proceed to examine the factors under Section 3553(a) before deciding the Motion, those factors weigh against granting the Motion.

The Government's candor, attempts to provide the Court the clarity it sought, and relative evenhandedness on the issues raised in the Court's Order (Doc. No. 489) is to be commended. Like any party (or counsel), the Government gains credibility (in this and other cases) when it does not oversell its position. It is somewhat unclear to the Court, though, what position the Government now *really* takes on the ultimate question of whether to grant the Motion. On balance, though, the Court must take the Government's claim that the Section 3553(a) factors weigh against granting the motion as an expression (albeit a tepid one) of continuing opposition to the motion.

<u>ANALYSIS</u>

The stage is thus set for the Court to decide the Motion. The Court begins by describing the legal framework for such motions. It then resolves the applicable issues in turn: (a) whether the Motion is cognizable despite the Government's claim that Defendant has not met the exhaustion requirement; and, if so, (b) whether Defendant is eligible—or, more precisely, eligible to be further considered—for compassionate release; and, if so, (c) whether, upon further consideration (*i.e.*, consideration of the factors set forth in 18 U.S.C. § 3553(a)), the Motion should be granted.

## I.    LAW GOVERNING COMPASSIONATE RELEASE MOTIONS

Under 18 U.S.C. § 3582(c)(1)(A), as modified by the Section 603(b)(1) First Step Act of 2018, P.L. 115-391, 132 Stat. 5239,[2] the district court may reduce a sentence of imprisonment upon motion of a defendant after the defendant has *either* fully exhausted all administrative rights to appeal a failure of the BOP to file such a motion on the defendant's behalf *or* waited at least 30 days since the defendant requested BOP to file such a motion.[3]

Once it properly can act on a compassionate release motion, the district court can reduce a sentence under that provision (for any defendant younger than 70 years old)[4] only if it finds extraordinary and compelling reasons to do so. *See* 18 U.S.C. § 3582(c)(1)(A)(i). And the Court does not write on a clean slate in considering whether to make such finding.

Congress tasked the Sentencing Commission with promulgating "general policy statements regarding . . . the appropriate use of . . . the sentence modification provisions set forth in [Section] 3582(c) of title 18. . . ." 28 U.S.C. § 994(a)(2)(C). Congress directed the Sentencing Commission, in promulgating these policy statements, to "describe what should be considered extraordinary and

---

[2] That paragraph of Section 603 provides:

     (b) INCREASING THE USE AND TRANSPARENCY OF COMPASSIONATE RELEASE.—Section 3582 of title 18, United States Code, is amended—
     (1) in subsection (c)(1)(A), in the matter preceding clause (i), by inserting after ''Bureau of Prisons,'' the following: ''or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . "

[3] The Court will refer to these two alternative requirements for short as the "exhaustion" requirement, even though the latter alternative actually requires the defendant not to exhaust remedies but rather merely to wait a certain number of days after making a sufficient request, during which his or her remedies may or may not become exhausted, depending on the timing of BOP's response to the request.

[4] This subparagraph provides an alternative ground for relief for defendants who are at least 70 years of age. *See* 18 U.S.C. § 3582(c)(1)(A). It is inapplicable here, however, because Defendant is in his late 50s.

compelling reasons for sentence reduction, including criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). In response to these congressional instructions, the Sentencing Commission promulgated U.S.S.G. § 1B1.13, and its application note, which collectively comprise the policy statement(s).

Together, they do two things that are relevant here. First, they define, in Application Note 1, "extraordinary and compelling reasons" to apply in (and only in) five separate and particular categories, which the Court discusses below. *See* U.S.S.G. § 1B1.13 n.1(A)(i)-(ii), (B), (C) & (D).[5] Second, they prescribe additional requirements for obtaining a sentence reduction where the defendant does meet the threshold requirement of "extraordinary and compelling reasons." Specifically, for a defendant not yet 70 years old (such as Defendant), the court may reduce a sentence if (1) extraordinary and compelling reasons warrant a reduction, *and* (2) the defendant is not a danger to the safety of any other person or to the community, *and* (3) the reduction is consistent with the policy statement. *See* U.S.S.G. § 1B1.13(1)(A), (2) & (3). The Application Note indicates the third requirement may be redundant of the first two, inasmuch as it states that "any reduction made . . . for the reasons set forth in subdivisions (1) and (2) [*i.e.*, U.S.S.G. § 1B1.13(1) & (2)] is consistent with this policy statement." *Id.* at n.5.[6]

Practitioners of federal criminal law are accustomed to treating the Sentencing Commission's policy statements as advisory only (especially in the aftermath of *United States v.*

---

[5] The Application Note also contains various other instructions for considering whether extraordinary and compelling reasons exist. Such instructions need not be considered here, however, given that the Court is able to resolve the issue clearly, as discussed below, without reference to them.

[6] Like many redundancies, this one may seem odd due to its apparent unnecessariness. But it seems motivated by the valid desire to both ensure that the Sentencing Commission's criteria for a sentencing reduction expressly: (a) included the congressional requirement, discussed below, that any reduction be "consistent with applicable policy statements issued by" the Sentencing Commission; and (b) clarified that the required consistency involved nothing more than satisfaction of U.S.S.G. § 1B1.13(1) & (2).

*Booker*, 543 U.S. 220 (2005)). They are exactly that in the context of a defendant's original sentencing—but not in the context of a motion under Section 3582(c)(1)(A). In the latter context, they are by statute mandatory, inasmuch as Congress has prohibited courts from granting a sentencing reduction unless "such a reduction is consistent with applicable policy statements issued by" the Sentencing Commission. 18 U.S.C. § 3582(c)(1)(A).[7]

If the court does finds extraordinary and compelling reasons for a sentence reduction, it does not automatically grant the motion for a reduction. Instead, it *may*, after considering the factors set forth in 18 U.S.C. § 3553(a), reduce the term of imprisonment (and may impose a term of probation or supervised release that does not exceed the unserved portion of the original term of imprisonment). *See* 18 U.S.C. § 3582(c)(1)(A).

The (familiar) sentencing factors set forth in Section 3553(a) include:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;
(2)     the need for the sentence imposed—
        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
        (B) to afford adequate deterrence to criminal conduct;
        (C) to protect the public from further crimes of the defendant; and
        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3)     the kinds of sentences available;
(4)     the kinds of sentence and the sentencing range established for—
        (A) the applicable category of offense committed by the applicable category of defendant as set forth in the . . .
                (i) [United States Sentencing Guidelines, ("U.S.S.G.")]—
                (ii) [in effect at the time of sentencing]
(5)     any pertinent policy statement—
        (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code; and

---

[7] In *Booker*, the Supreme Court found unconstitutional (specifically, violative of the Sixth Amendment) Congress's directive that the Sentencing Guidelines are generally what was referred to "mandatory," meaning that a sentence generally had to be imposed within the guideline range calculated using the Sentencing Guidelines. To say the least, this limited Congress's ability to make anything about the Sentencing Guidelines mandatory in the context of an original sentencing. But such limitations do not exists in the context of a motion for sentence reduction under Section 3582(c)(1)(A), wherein the Sixth Amendment concerns driving the *Booker* decision are entirely absent.

(B) [and in effect at the time of sentencing]

(6)      the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)      the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Relevant to the fifth factor, as discussed above, the Sentencing Commission has issued a binding policy statement regarding reduction of a term of imprisonment under Section 3582(c)(1)(A). *See* U.S.S.G. § 1B1.13. As further mentioned above, Application Note 1 to U.S.S.G. § 1B1.13 speaks to what constitutes "extraordinary and compelling reasons," identifying five categories of situations where such reasons may be found to exist. Two of the five involve the defendant's medical condition, *i.e.*: (i) "[t]he defendant is suffering from a terminal illness"; or (ii) "the defendant is suffering from a serious physical or medical condition, . . . [or] serious functional or cognitive impairment, or . . . deteriorating physical or mental health due to the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 n.1(A). The next two categories relate to defendants over 65 years old and defendants with particular grave family circumstances, respectively; they are not applicable to the instant Motion.

That takes us to the last of the five categories. The Application Note describes this category—which is sometimes called the "residual" or "catchall" category—as encompassing the situation where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 n.1(D). As discussed

above, the Court (and the Government) are of the mind that the catchall category does not apply where, as here, the Director of BOP has not made the kind of determination described therein.

II.     EXHAUSTION

As indicated above, the Court is mindful of the exhaustion requirement and will not disregard it. It will, however, apply it based on a practical reading of the record. The Government asserts that although Defendant has made a request for *home confinement*, he has not made a request for *compassionate release*. The distinction is real, and its significance is not lost upon the Court. Moreover, the Government's reference to the distinction is fair enough, inasmuch as the document originally filed by Defendant in this Court (Doc. No. 478-3)—a copy of his original request to BOP on a Form BP 8—is reasonably characterized as the former and not the latter. But Defendant thereafter filed a copy of an April 9, 2020 email he sent to his BOP case manager ("MS Harris") specifically describing this form as having requested "compassionate release" and urging that action be taken on the request. (Doc. No. 495-1). He also filed an email to his case manager dated April 13, 2020 in which he requests a formal denial of "compassionate release" from the Warden.[8] There is no question that Defendant made substantial steps to apprise the Warden specifically of a request for compassionate release and that BOP employees have been aware of that request for some time. Under these circumstances, the Court is unwilling to treat Defendant as not having made a request for compassionate release at least 30 days ago, and it will proceed to decide the Motion on the merits.

---

[8] In addition, the Government filed an affidavit executed by the Associate Warden of FMC, specifically on the style of this case, on May 6, 2020. (Doc. No. 483-1). This shows that upper management at the facility has been aware of Defendant's request for compassionate release, if not necessarily the full 30 days, at least something by now very close to it.

III.    EXTRAORDINARY AND COMPELLING REASONS

In addressing the merits, the Court first must determine whether "extraordinary and compelling reasons" exist for Defendant's compassionate release under the standards set forth by U.S.S.G. § 1B1.13 and its application note. Defendant bears the burden to show that extraordinary and compelling reasons exist warranting his release. *United States v. Shabudin*, No. 11-CR-00664-JSW-1, --- F. Supp. 3d ----, 2020 WL 2464751, at *3 (N.D. Cal. May 12, 2020); *United States v. Crouch*, No. 5:19-CR-00029-TBR, 2020 WL 1963781, at *3 (W.D. Ky. Apr. 23, 2020) ("[Defendant's] circumstances do not meet the burden of extraordinary and compelling.").

From the Court's independent research, it has reason to believe that the Government's view in this case as to whether the requirements of Application Note 1(A)(ii)(I) have been satisfied— one of neutrality—is subject to an intervening department-wide change policy change whereby the Department of Justice would take the affirmative view that the requirements of Application Note 1(A)(ii)(I) *have* been satisfied here. A district court addressed this shift very recently in *Wise v. United States*, No. 1:18-cr-72, 2020 WL 2614816 (D. Md. May 22, 2020). In *Wise*, the court noted that "just last week, the Department of Justice adopted the position that any inmate who suffers from the chronic conditions associated with severe illness from COVID-19 are eligible for compassionate release." *Id.* at *7. The court explained:

> After the drafting of this opinion was largely completed, the government amended its response. *See* ECF 185. In that filing, the government advised that the Department of Justice had recently "taken the position that inmates who suffer from a condition identified . . . as putting them at higher risk for severe illness from COVID-19 and who are not expected to recover from that condition, present an 'extraordinary and compelling reason' to be considered for compassionate release."

*Id.* at *6 n.4. [9] The Government's filing at ECF 185 in that case had explained, in pertinent part:

---

[9] Even though (as discussed herein) this position well may now represent the Department of Justice's uniform and nationwide view, the undersigned will not presume to hold the Government to this (or any other) position in other

The Government writes to **amend** its Response to the Defendant's Motion for Compassionate Release and Sentence Modification. ECF 180. Since filing its response on May 11, 2020, undersigned counsel has been informed that the Department of Justice ("DOJ") has taken the position that inmates who suffer from a condition identified by the Center for Disease Control and Prevention ("CDC") as putting them at higher risk for severe illness from COVID-19 and who are not expected to recover from that condition, present an "extraordinary and compelling reason" to be considered for compassionate release—even if that condition in ordinary times would not meet the terms of the policy statement. *See* U.S.S.G. § 1B1.13 cmt. n. 1(A)(ii)(I).

These CDC risk factors include:
- People 65 years and older;
- People who live in a nursing home or long-term care facility'
- People of all ages with underlying medical conditions, particularly if not well controlled, including:
  - People with chronic lung disease or moderate to severe asthma
  - People who have serious heart conditions
  - People who are immunocompromised
    - Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications
  - People with severe obesity (body mass index [BMI] of 40 or higher)
  - People with diabetes
  - People with chronic kidney disease undergoing dialysis
  - People with liver disease

*Wise v. United States*, No. 1:18-cr-72, Doc. No. 185 at 1-2 (D. Md. May 22, 2020) (emphasis in original).

To say the least, this policy had not been (or at least not always been) reflected in the Government's position in responses to motions for compassionate release brought in the wake of COVID-19. Far from it. The policy, in the Court's view, constitutes a major change; one that— helpfully for courts and mercifully to defendants—will largely eliminate the need for fact-intensive inquiries into whether a defendant's particular chronic condition on the above list will, in light of

---

cases. For a variety of reasons, the Government conceivably could take a different position in one or more future cases. If it does, the undersigned will address those positions as they are presented.

conditions at the defendant's particular place of incarceration, satisfy U.S.S.G. § 1B1.13 Application Note 1(A)(ii)(I).

And if the policy applies here, then Defendant has shown "extraordinary and compelling reasons" for compassionate release pursuant to U.S.S.G. § 1B1.13 Application Note 1(A)(ii)(I) based on his Type 2 (or "II") diabetes alone. As the Government put it in *Wise*:

> [Defendant] does suffer from Type II diabetes, which is clearly identified as a risk factor by the CDC. Thus, consistent with current DOJ policy, the Government does not contest the Defendant's eligibility for being considered for compassionate release in this case because he suffers from a condition identified by the CDC as putting him at higher risk for severe illness. *See* U.S.S.G. § 1B1.13 cmt. n. 1(A)(ii)(I).

(*Id.* at 2).

The Government has not brought this apparently nationwide policy to the Court's attention in this case, and the Court is loath to make assumptions about the Government's position in any particular case. And so the Court does not claim that the position set forth by the Government in the District of Maryland—based on the new policy—is for certain the position of the Government in this case. But the Court has reason to believe that, as apparently a nationwide DOJ policy, it necessarily *should be* the Government's position in this case. In any event, in this case "the [G]overnment leaves it to the discretion of this Court to determine whether Defendant's current medical condition and situation at FMC Fort Worth satisfy the 'extraordinary and compelling' standard." (Doc. No. 493 at 4).

Invited to exercise that discretion, the Court—considering DOJ's apparent new nationwide policy and the reasons articulated by each party as to why the standard of Application Note 1(A)(ii)(I) could be deemed satisfied in this case—concludes that Defendant has met his burden of satisfying the applicable "extraordinary and compelling reasons" standard of Application Note 1(A)(ii)(I) in this case based on his Type II diabetes alone.

This means that Defendant meets the requirements to be considered for compassionate release, provided that he is not a danger to other persons or the community. *See* U.S.S.G. § 1B1.13. The Court finds that he is not, for the reasons discussed below in connection with the history and characteristics of the defendant, the need for general and specific deterrence, and the need to protect the public from further crimes of Defendant.

IV.    SECTION 3353(a) FACTORS

Despite having made the required showing of extraordinary and compelling reasons justifying release, Defendant nevertheless is entitled to compassionate release only if such release is warranted considering the above-listed factors set forth in 18 U.S.C. § 3553(a). The Court will discuss each in turn, aware that some factors overlap to a large extent with other factors, and at times cross-referencing its discussion of one factor when discussing another factor.

*The nature and circumstances of the (2) offenses of conviction* counsel neither in favor of nor against release. The charged offenses comprised: one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371; one count for each of 15 different mailings in furtherance of a scheme to defraud, in violation of 18 U.S.C. § 1341; 11 counts of money laundering, each based on an interstate wire transfer constituting a monetary transaction in criminally derived property (property derived from the mail-fraud scheme), in violation of 18 U.S.C. § 1957; and one count of false statements in a matter within the jurisdiction of the United States government, based on the submission of bogus documents to the Grand Jury in this district falsely representing the pedigree of particular pharmaceuticals, in violation of 18 U.S.C. § 1001. The offenses of conviction, however, comprised only one count of wire fraud (Count 2) and one count of money laundering (Count 27). It appears, though, that Defendant conceded (in his plea agreement), for purposes of relevant conduct in the calculation of his guideline range under the United States

Sentencing Guidelines, his commission of the acts alleged in the charge brought under 18 U.S.C. § 1001.

Notably, the crux of the scheme to defraud was selling to unwitting pharmacies prescription drugs known by Defendant (and his co-defendants) to have been diverted, *i.e.*, obtained (unbeknownst to the pharmacies) from sellers who were not licensed or authorized to distribute prescription drugs and who obtained the prescription drugs second-hand from patients who had received the drugs via legitimate prescriptions. And the scheme was not small potatoes; it engendered a loss (for purposes of U.S.S.G. § 2B1.1) of between $7 million and $20 million. (Doc. No. 450 at 9).

Just to describe these offenses, and the related conduct of obstruction of justice, is to pronounce their seriousness. The crimes constituted an affront to our healthcare system, financial system, and system of justice. It is almost as if Defendant left no stone unturned in his crimes. On second glance, though, he actually did—he left unturned the stone of violence. His crimes fostered all kinds of dangers, but at least violence was not one of them—a fact that decreases the risk attributable to his potential release. Moreover, the crimes of conviction (and the established related conduct of obstruction of justice for which Defendant was not convicted) are not of the type generally associated with a substantial risk of recidivism. Perpetrators of certain crimes (especially those, unlike Defendant, who have substance abuse issues) may tend, seemingly reflexively, to return to those crimes. But schemes to defraud via selling diverted drugs, monetary transactions involving property derived from such schemes, and obstructing justice by foisting bogus documents on a grand jury are not of this type; avoidance of a repeat of such conduct is far from a long shot.

*The history and characteristics of the Defendant* counsel in favor of release. First, Defendant has only one conviction besides the instant offenses of conviction, and that was for conduct that occurred in March 1992. Certainly, the nature of that conviction (indecency with a child) is of considerable concern. However, the Court is unaware of any such conduct occurring in the more than 28 years since then. Also, as Defendant notes, by Texas state court order issued in October 2007, he was granted early termination of the obligation to register as a sex offender, which provides reason to believe that even a dozen years ago, the risk of repetition of such criminal conduct was attenuated. Moreover, Defendant has a lengthy work history—some as an employee and some as an owner of his own business—most of it not involving his three-year stint as part owner of Cumberland Distribution that underlies all of the instant offenses. It is true that Defendant has been very transient in his work, jumping from position to position with great frequency, but this does not appear to be the result of anything particularly nefarious or condemning. He also reportedly has strong family support from family members, which would be helpful in Defendant's re-integration into society. Also, there is no history of any substance abuse, a fact that substantially indicates a diminished risk to the public.

Finally, the fact that Defendant accepted responsibly for his crimes, cooperated, and did so in any manner that the Government clearly found acceptable, speaks well of him.[10] It is true that the record reflects nothing extraordinary in terms of cooperation, such as any great personal risk it imposed upon Defendant or the provision of blockbuster testimony at some trial. And it is also true that some cooperators may be cynical, insincere, and entirely self-interested. But in general,

---

[10] That is not to say in any way, shape or form that it speaks poorly of a defendant if he or she chooses not to cooperate (if such is even an option, based on the Government's stance). A defendant has a right not to cooperate; the choice is the defendant's, and the Court does not deny that for many defendants the better choice is not to cooperate. But whatever the reason, and however wise the decision, the Court does not hold a decision not to cooperate against a defendant. The Court here means to say only that cooperation can indicate positive things about a cooperating defendant.

all other things being equal, cooperation tends to show a desire to get on the right side of the law, to put criminality behind oneself, to accept responsibility, and to make amends. In this case, there is no reason to believe that Defendant was not driven in part by such laudable considerations.

*The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense* all counsel somewhat against granting compassionate release. Compassionate release at this time would effectively cut a 72-month sentence—of which Defendant appears likely to serve approximately 62 months—[11]to approximately 21 months. In the Court's mind, there is no question that a total sentence of 21 months for these crimes of conviction is somewhat inadequate to meet these three needs, even taking into account all relevant circumstances (including Defendant's cooperation). But the inadequacy, though real, is not huge. It seems that the Government would have to agree with this. At sentencing, it recommended a sentence of 48 months. (Doc. No. 450 at 16-17); with apparently likely credit for good-time served, that would mean serving approximately 41 months. Thus, prompt release pursuant to a grant of the Motion would effectively cut Defendant's time served very nearly in half from what would have been served had the Government's recommendation been accepted. Though not insignificant, this decrease is not one of orders of magnitude.

*The need to afford adequate deterrence to criminal conduct* cuts slightly against Defendant's release. The Court will assume[12] that the Court needs to ask simply whether the

---

[11] The Court bases this on the reasonable assumption that Defendant is on track to receive 54 days of good-time credit a year for each of the seven years of the sentence imposed, pursuant to 18 U.S.C. § 3624(b). The Court notes that in sentencing defendants, it never makes any such assumption; this means, among other things, that it never imposes a higher sentence than it otherwise would have, under the assumption that the sentence served will actually be shorter because the defendant will receive good-time credit. But in the context of considering the instant Motion for resentencing, the Court believes that it is appropriate to consider the likely net effect of granting the Motion, which requires an assessment of the likely difference between the sentence that would be served if the Motion were granted and the sentence likely to be served in the Motion were not granted.

[12] This assumption actually cuts against Defendant's position that the Motion should be granted, but it ultimately does not harm Defendant inasmuch as the Court's ultimate decision is to grant the Motion.

reduced sentence Defendant is requesting (approximately 21 months, as noted above) affords adequate deterrence—and not whether such a reduced sentence, *understood by Defendant and the public to really remain a 72-month sentence that just happened anomalously to be reduced to 21 months* based on the unique circumstances of COVID-19, affords adequate deterrence. In terms of specific deterrence (of Defendant), the Court believes that a 21-month sentence is sufficient, if only minimally; at this stage of his life in particular, it strikes the Court as unlikely that Defendant will engage again in this sort of behavior, and that the prospect of a 21-month sentence would be adequate to disincentivize him. As for general deterrence (of the public at large), it is not quite adequately served by a sentence of 21 months; such a sentence would deter many would-be fraudsters, but others unfortunately well might be inclined to find that the potential risk/potential reward balance (the possibility of 21 months versus the possibility of millions of ill-gotten gains) tips in favor of this criminality when the countervailing risk is only 21 months' imprisonment.

*The need to protect the public from further crimes of the defendant* cuts in favor of compassionate release. As discussed above: (a) Defendant is unlikely to engage again in the kind of criminal gambit that led to the instant offenses of conviction and the related conduct of obstruction of justice; and (b) other than those offenses, it has been more than 28 years since any known crimes have been committed by Defendant. In addition, after having his initial appearance in this case (in the Southern District of Florida) on January 30, 2013, (Doc. No. 10), Defendant was on pretrial release in this case for *more than five and a half years* prior to reporting to FMC Forth Worth in September 2018, without any known (or even alleged) violations of conditions of release—a fact that indicates reason to believe that Defendant will stay compliant, if released, for the entire period that he would otherwise serve. Moreover, it appears that there are no blemishes on his disciplinary record while in BOP custody. In addition, as discussed above, Defendant's

cooperation tends to suggest a desire to get on and stay on the right side of the law—and the favor his cooperation found with the Government suggests that he is motivated and has potential to remain that way. All of this indicates a substantially attenuated need to protect the public. [13]

But to the extent such need does exist, it can be accounted for largely by a responsible release plan and by the oversight provided by supervised release. Defendant has presented a plan of living at home with his wife and teenage children; even though his wife was his (convicted) co-schemer in this case, the plan is reasonable because there is no particular reason to believe the couple will dare to jointly undertake criminal activity in the future and because such domestic arrangement suggests the possibility of domestic stability, a factor that tends to reduce recidivism generally. As specifically contemplated by Defendant, (Doc. No. 481 at 10), his supervised release can include a new condition, a substantial term of home confinement beginning as soon as practicable upon his release from custody; such a condition would add to the protective effects that supervised release bestows upon society.

*The need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner* cuts in favor of compassionate release. The focus in this case plainly is on the need for medical care. Typically, in original sentencings, the "need to provide the defendant . . . with needed medical care" relates to the Court's recommendations to BOP as to what medical treatment should be considered and where the sentence should be served. In the instant context, though, it is fairly construed to refer more generally to the need to assess whether Defendant's medical condition can be adequately handled

---

[13] As for the need to protect the public from something different—the possibility of contracting COVID-19 from Defendant—that can reasonably be accounted for by requiring that Defendant completes a period of 14 days of quarantine either: (a) immediately prior to release from BOP custody, should BOP chose to impose this quarantine; or (b) into self-quarantine for 14 days upon arrival at his residence. The Court bases this requirement on what it perceives to be one of the near-universally accepted truths about the COVID-19, *i.e.*, that its maximum incubation period is right at 14 days.

in a BOP facility. Defendant claims that the answer is no, pointing to the gravity of the outbreak at the particular facility where he is incarcerated—which substantially increases the likelihood that he will become infected—[14]and to his medical conditions, which he says render him especially vulnerable to bad outcomes should he become infected.

The Court will not act like it knows the extent to which Defendant's chances of infection would be lower if he is released than if he stays in BOP custody, or how much more likely a bad outcome upon infection would be for him as opposed to someone with a more typical medical profile. As matter of sheer epistemology, the undersigned cannot and does not know such things. This is true despite publicly available information from medical experts and public health officials, inasmuch as they do not always agree with one another on issues related to COVID-19 and inasmuch as they seem to have reversed themselves on numerous issues over time.[15] In short, information and opinions regarding the prevalence of, effect of, and optimal countermeasures to COVID-10 have been and remain in constant flux, and it would be folly for the Court to rely on any particular opinion or factual assertion merely because it comes from a purportedly knowledgeable or reputable source.

Having said that, the Court is willing to accept that he is at high risk of infection in BOP custody, given the undisputed existence of a major COVID-19 outbreak at FMC Fort Worth. The Court is also willing to accept that Defendant's significantly impaired health makes him especially

---

[14] One possible response for handling this increased risk would be to transfer inmates at the facility to another facility. However, the Court sees no indication at all that BOP contemplates moving Defendant to a different, safer facility.

[15] It seems clear to the undersigned that certain public health authorities, public health officials, and other public officials over time have equivocated regarding, or even starkly changed, their views concerning one or more of numerous issues, including but not limited to: whether COVID-19 can be transmitted person to person; whether persons should avoid crowds and/or otherwise alter their daily regimen due to the presence of COVID-19 in the United States; the likely death toll and mortality rate from COVID-19; whether masks/face coverings should be worn; and the extent to which COVID-19 may be transmitted via contact with inanimate surfaces.

prone to bad outcomes in case of infection. The Court further notes that Defendant's claim of serious medical conditions is not new; it is not as if the alleged seriousness of his medical condition has been embellished or, worse, made up out of whole cloth in an effort to seek compassionate release. Rather, it was detailed in his Presentence Investigation Report (Doc. No. 434 at 21-23), discussed and acknowledged by all at Defendant's sentencing as a major concern (Doc. No. 450 at 13, 17-18, 22), and the basis for his placement within the BOP system. The seriousness, which has consistently been spoken of in terms of mortality, also is reflected in various medical records filed by Defendant. (Doc. Nos. 478-5, 485-1, 486). As noted above, the Government concedes the potentially devastating impact a COVID-19 infection could have upon Defendant in light of his medical condition. (Doc. No. 493 at 3). And the Court notes that according to news reporting that in the Court's view is very unlikely to be materially inaccurate, as of mid-May eight inmates at FMC Fort Worth had died after contracting COVID-19. *See* Frank Heinz, *Eighth Inmate at FMC Fort Worth Dies After Contracting COVID-19*, NBCDFW (May 15, 2020, 4:50 PM), https://www.nbcdfw.com/news/coronavirus/eighth-inmate-at-fmc-fort-worth-dies-after-contracting-covid-19/2370564 (last accessed June 1, 2020).

Next, given Defendant's lack of prior criminal history since 1992, and the fact that he was (as far as the record shows) entirely compliant with conditions of pretrial release in this case for *more than five and a half years* prior to reporting to FMC Forth Worth in September 2018, Defendant has demonstrated an ability (outside of the instant offenses of conviction) to comply with rules and societal norms; this is vital, because under his own theory (and the widely-accepted view worldwide), decreasing his risk of infection upon release from BOP custody would require him to observe public/health and societal norms related to COVID-19, such as handwashing and social distancing. This ability distinguishes Defendant from many other inmates, whose history in

such matters unfortunately indicates an unlikelihood to follow any rules or norms even where so doing is to the benefit of themselves and those around them. Defendant personally has presented (in the first three sentences quoted below) particular steps he intends to take to further reduce his risk of infection. Because Defendant presents good odds of complying with the relevant standards, and also with the conditions of home confinement that will further reduce his risk of infection, there is an unusually firm basis to believe that Defendant's release is likely *in actuality*—not just theory—to reduce his risk of infection from COVID-19.

Defendant also has presented reasons to believe that he actually, not just theoretically, will fare better outside of BOP custody if he were to be infected with COVID-19. Specifically, Defendant explained in an email to his case manager at BOP:

I have a release plan where my adult daughter will pick me up from here with proper PPE for her, mine and community safety. I have access to PPE from my son and daughter in law that are Radiology Technologist at the Hospital near my home. I have a room to quarantine in for 14 days. I will have insurance upon release, my doctors are near my home including 4 major hospitals.

(Doc. No. 495-1 at 1).[16]

While the first three sentences reflect planning and available resources to avoid infection, the last sentence reflects planning and available resources to deal with health issues that may arise should Defendant be infected. This further distinguishes Defendant from many other inmates seeking release, who appear to lack plans and resources to enable them to cope with an infection

---

[16] The Court is cautious about accepting self-serving statements from parties, especially not subject to cross-examination. And it will not do so blindly, especially when the statement comes from a defendant in a case wherein (with his own acquiescence in his plea agreement) he received a two-level upward adjustment for obstruction of justice based apparently on his knowingly presenting to a Grand Jury false documents containing statements known to be materially false. But just as this sentencing enhancement shows that Defendant is not above making knowingly false statements to BOP, it shows that Defendant relatively recently has recently been provided with a stark disincentive (the addition of two levels to the calculation of his sentencing guidelines) to try to get away with such false statements. A further disincentive is the fact that, as Defendant surely must have known, any falsity of such statements stands a good chance to be revealed, to the presumably great displeasure of the Court and United States Probation Office in the event the Motion is granted. Moreover, the Government has not taken issue with the truth of any of these statements. For these reasons, the Court credits Defendant's statements here.

as well (or better) upon release as they would in the custody of BOP, which does have resources (strained and limited though they may be) to confer upon infected inmates.

*The guideline range under the United States Sentencing Guidelines* ultimately militates neither in favor of nor against release. It is true that the bottom of the *pre-departure* guideline range (235-293 months) is much, much higher than the 72-month sentence imposed, and still more higher than the sentence Defendant now requests. However, the relevant guideline range here is the *post-departure* (*i.e.*, final) guideline range. And here, upon the Government's motion pursuant to U.S.S.G. § 5K1.1, the Court granted a downward departure. (Doc. No. 426 at 1).[17] As this is a guideline-based departure, that means that the guideline range necessarily was lowered from 235-293 months. But unfortunately, the undersigned (who did not preside at sentencing or any prior stage in this case) cannot tell how much the guideline range was lowered. The sealed statement of reasons for the sentence (Doc. No. 426) indicates, in part VI(C), that the Court granted a variance as well as a downward departure, but part VI(B) indicates otherwise. And the sentencing transcript does not indicate how the Court got to the sentence that it did.[18] So the Court simply cannot tell the extent to which the Court got to 72 months by way of a departure as opposed to a variance; among other things, it cannot determine what the final guideline range was or where within the

---

[17] Doc. No. 426 is the sealed statement of reasons for the sentence in this case. Where the Court has referred to a document under seal, as it did here and elsewhere herein, the Court is unsealing the substance of the document only to the extent necessary to make the reference to the document; the document otherwise is not intended to be and has not been otherwise unsealed.

[18] The plea agreement in this case was entered into pursuant to Rule 11(c)(1)(C) but in this case (unlike some cases involving such a plea agreement) the plea agreement does not help explain in retrospect how the Court got to its sentence of 72 months. The plea agreement contained the so-called binding recommendation that the sentence not exceed 96 months, and when the parties (at sentencing) did present more specific non-binding sentencing recommendations lower than 96 months, the Court rejected each party's recommendation. So the plea agreement does not serve as a roadmap for how the Court must have arrived at the sentence it did.

final guideline range the Court imposed sentence.[19] The most the undersigned can say is that—making the safe assumption that any variance was not actually an *upward* variance—the post-departure guideline range must have been high enough that 72 months fit within it (and perhaps higher, if in fact there was a downward variance). That in turn means that the final guideline range could have been as low as 63-78 months. But the undersigned simply cannot say what it was. The most he can say is that whatever the final guideline range was, it was substantially higher than the sentence Defendant now seeks pursuant to the Motion. But the Court has already adequately accounted for this kind of discrepancy when discussing the discrepancy between the sentence Defendant now seeks on the one hand, and the sentence originally requested by the Government and the sentence originally imposed by the Court. In sum, the final guideline range here is both inscrutable and not particularly helpful.

To the Court's understanding, on this Motion there are not any pertinent *policy statements issued by the United States Sentencing Commission.* Pertinent sections of the United States Sentencing Guidelines (especially U.S.S.G. § 1B.13)? Yes. But provisions of United States Sentencing Guidelines designated as policy statements? No.

*The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct* cuts neither in favor of or against compassionate release. In the Court's view, there is little doubt that the amended sentence Defendant now seeks would result in a disparately low sentence compared to defendants convicted of (relatively) similar conduct with similar criminal history. Given the seriousness of the charges

---

[19] It may seem at times that the issue of how a court, presented with both a motion for a downward departure and a motion for a variance, arrives at a sentence that is below the pre-departure guideline range is academic, therefore need not be resolved explicitly and clearly. The undersigned certainly understands such a perception. But the instant Motion reflects how important in rare cases it can prove, in retrospect, to precisely pronounce a post-departure guideline range before proceeding to a variance motion.

and the very high pre-departure guideline range, a sentence of roughly 21 months would indeed be unusually low for this kind of crime, even taking into account Defendant's relatively low criminal history category and cooperation (which, as noted above, does not appear from the record to have been anything special). And such a disparity is regrettable to the extent that it might be attributable, for some similarly-situated defendants, to their ineligibility for compassionate release because of their relative good health due to laudable, prudent lifestyle choices.[20] On the other hand, that is not to say that if Defendant receives a lower (amended) sentence due to compassionate release, that would be "unwarranted"; instead, it is appropriately deemed "warranted" on balance for the reasons discussed herein—not least to remove him from an especially dangerous environment for him. And, more fundamentally, truly valid comparators for Defendant— defendants with similar records who have been found guilty of similar conduct—are hard to find, given the uniqueness of his criminal conduct, his relatively unusual criminal history (or recent lack thereof), and successful cooperation. For all of these reasons, the Court cannot ultimately find that granting compassionate release would result in a sentence that runs afoul of this sentencing factor by standing out in some sort of clear comparison to other sentences.

*The need to provide restitution* is inapplicable here. Despite the existence, for guideline purposes, of between $7 million and $20 million in loss and more than 50 victims, no order of restitution ultimately was entered in this case.

---

[20] The Court does not imply here in any way that Defendant's health is a result of any choices he has made or is his fault in any way.

<u>SUMMARY</u>

As the above discussion suggests, there are facts (and factors) pointing in different directions with respect to the balancing of the Section 3553(a) factors. On balance, though, the factors support release. The most salient factors are the need to protect the public and the need for specific deterrence—which are nearly absent here—and the need to provide Defendant with medical care, which is very much present here and, based on the Court's best understanding of COVID-19, appears likely to be better satisfied outside of BOP custody. The Court therefore will grant the Motion.

The Court is mindful that compassionate release is an extraordinary remedy. *See, e.g., United States v. Rizzo*, No. CR 16-20732, 2020 WL 2092648, at *3 (E.D. Mich. May 1, 2020). That is why the Court's analysis here, truth be told, went perhaps unusually far into the weeds. It needed to. Compassionate release is not ordered lightly or justified easily. So when it is ordered, it should be very clear why the Court is granting a particular defendant a form of relief that, as is a matter of public record, has been very often denied to others nationwide (for reasons this Court does not dispute). The Court believes that its recounting and analysis of the material facts provide that clarity.

<u>CONCLUSION</u>

For the foregoing reasons, the Court will grant the Motion (Doc. No. 481). Defendant's sentence will be reduced to time served, plus up to 14 days in the discretion of BOP to quarantine Defendant prior to release. The terms and conditions of supervised release to which Defendant was originally sentenced will remain in place, with the added conditions, as discussed above, that he will serve a period of home detention for a period of six months, and will be required to self-

quarantine upon arrival at his residence if he did not complete a 14-day period of quarantine immediately prior to release from BOP custody.

An appropriate Order (Doc. No. 500) has been entered, and an Amended Judgment in a Criminal Case also will be entered.


_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE